**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FREDERICK GRAHAM,** | : | |
| **Plaintiff** | : | |
| | : | **No. 1:19-cv-01571** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **IAN CONNORS, <u>et</u> <u>al.</u>,** | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

Presently before the Court is the motion to dismiss and for summary judgment (Doc. No. 45) filed by remaining Defendants Andrew Edinger ("Edinger") and P. Viator ("Viator"). <u>Pro</u> <u>se</u> Plaintiff Frederick Graham ("Plaintiff") has filed neither a response to the motion nor a motion seeking an extension of time to do so. Accordingly, because the time period for filing a response has expired, Defendants' motion is ripe for disposition. For the reasons that follow, the Court will grant the motion to dismiss and for summary judgment.

## I.   BACKGROUND

Plaintiff, who is presently confined at the Administrative United States Penitentiary in Thomson, Illinois ("AUSP Thomson"), initiated the above-captioned action on August 29, 2019, while he was incarcerated at the United States Penitentiary in Lewisburg, Pennsylvania ("USP Lewisburg"), by filing a complaint pursuant to <u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971), against Defendant Ian Connors ("Connors") in the United States District Court for the Eastern District of Pennsylvania. (Doc. No. 1.) Plaintiff also filed a motion for permanent injunctive relief. (Doc. No. 2.) On September 4, 2019, the Eastern District of Pennsylvania transferred the above-captioned case to this Court for further proceedings. (Doc. No. 5.) Shortly thereafter, Plaintiff filed several numerous motions, including several motions for injunctive relief. (Doc. Nos. 6, 7, 11, 12, 13, 14.) In an

administrative Order dated September 12, 2019, the Court directed Plaintiff either to pay the requisite filing fee or file a motion for leave to proceed in forma pauperis within thirty (30) days. (Doc. No. 10.)

In an Order dated September 20, 2019, the Court noted that Plaintiff was requesting emergency injunctive relief on the basis that he was experiencing organ failure due to his hunger strike, which had caused him to miss at least 219 consecutive meals. (Doc. No. 15.) Plaintiff suggested that medical staff at USP Lewisburg were not providing adequate medical care in the form of a proper force-feeding protocol. (Id.) Given Plaintiff's allegations of imminent harm, the Court directed the Government to respond to Plaintiff's motions by Monday, September 23, 2019. (Id.) The Government did so by filing a brief in opposition (Doc. No. 17) and exhibits in support thereof (Doc. No. 18).

On September 23, 2019, Plaintiff filed a motion for leave to proceed in forma pauperis (Doc. No. 19) and a motion for a temporary injunction (Doc. No. 21). In a Memorandum and Order dated October 9, 2019, the Court granted Plaintiff leave to proceed in forma pauperis, dismissed his complaint for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), and denied his various motions for relief. (Doc. Nos. 24, 25.) In doing so, the Court noted that Plaintiff's complaint "neither set[] forth any allegations against Defendant Connors nor identifie[d] how Defendant Connors engaged in any wrongdoing that violated Plaintiff's constitutional rights." (Doc. No. 24 at 10-11.) The Court concluded further that, with respect to Plaintiff's various motions, he had "not demonstrated that he [would] suffer irreparable injury if he is not granted the relief he seeks." (Id. at 13.) The Court granted Plaintiff leave to file an amended complaint within thirty (30) days. (Doc. No. 25.)

Plaintiff filed his amended complaint on November 18, 2019, naming as Defendants the Department of Health, Education, and Welfare ("DHEW"), Bureau of Prisons ("BOP") Director Kathleen Hawk Sawyer ("Sawyer"), Attorney General William Barr ("Barr"), BOP National Appeals Administrator Connors, BOP Regional Counsel Darrin Howard ("Howard"), Edinger, dentist Viator, D.J. Ebbert ("Ebbert"), and J. Konkle ("Konkle").  (Doc. No. 28.)  He also filed a supplement indicating that he also wished to proceed against Corizon.  (Doc. No. 30 at 1.)  With respect to Defendant Edinger, Plaintiff first alleges that Defendant Edinger denied him treatment during his hunger strike.  (Doc. Nos. 28 at 5; 30 at 2-3.)  Plaintiff maintains further that Defendant Edinger denied "all treatments," including prescriptions from an outside specialist and for soft shoes.  (Doc. No. 28 at 6.)  According to Plaintiff, he was placed on a top bunk in a top tier and denied the Dilaudid that had been prescribed to him by an outside provider.  (Id.) Plaintiff further faults Defendant Edinger for failing to send him to an outside provider when Plaintiff experienced "continued organ/kidney/liver failure from a history of elevated enzymes." (Id. at 13.)  Plaintiff further suggests that he has not been provided treatment for various ailments, including scoliosis, chronic pain, cervical spine injuries, and degenerative joint disease. (Id.)

With respect to Defendant Viator, Plaintiff alleges that he has refused to pull and replace Plaintiff's fillings.  (Id. at 13.)  He also suggests that Defendant Viator refuses Plaintiff annual dental examinations and cleanings and refuses to refer Plaintiff to an outside dentist.  (Id. at 14.) Plaintiff further alleges that Defendant Viator is "refusing to follow through with procedures" by failing to replace Plaintiff's partial dentures.  (Doc. No. 30 at 6.)  Specifically, he states Defendant Viator's refusal to create impressions for new partial dentures has caused him to develop fistulas and abscesses around his gum line and that he has been denied antibiotics for

those conditions.  (Id. at 4-6.)  Plaintiff seeks various forms of relief, including damages and

several amenities, including a cane, unlimited Ensure, brain surgery, injections, a medical

transfer, and the restoration of cigarettes and chewing tobacco to commissary.[1]  (Doc. No. 28 at

6-8, 10.)

In a Memorandum and Order dated January 21, 2020, the Court dismissed Plaintiff's

claims against all Defendants, with the exception of his claims against Defendants Edinger and

Viator, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C.

§ 1915(e)(2)(B)(ii).  (Doc. Nos. 33, 34.)  The Court granted Plaintiff leave to file a second

amended complaint with respect to his claims against all Defendants except the DHEW.  (Doc.

No. 34 at 1-2.)  Plaintiff was advised that if he failed to file a second amended complaint within

thirty (30) days, the Court would proceed on his amended complaint as to his Eighth Amendment

claims against Defendants Edinger and Viator.  (Id. at 2.)

Plaintiff did not file a second amended complaint.  Accordingly, in an Order dated

February 26, 2020, the Court directed the service of his amended complaint upon Defendants

Edinger and Viator.  (Doc. No. 39.)  Defendants filed their waivers of service on March 24, 2020

(Doc. Nos. 42, 43) and filed their motion to dismiss and for summary judgment on April 27,

2020 (Doc. No. 45).  Defendants filed their supporting materials on May 11, 2020.  (Doc. Nos.

46, 47.)

---

[1] Plaintiff's claims for declaratory and injunctive relief are moot in light of Plaintiff's transfer
from USP Lewisburg to AUSP Thomson.  See Debrew v. Auman, 354 F. App'x 639, 641 (3d
Cir. 2009) (citing Sutton v. Rasheed, 323 F.3d 236, 238 (3d Cir. 2003)).

## II.     LEGAL STANDARDS

### A.     Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

Federal notice and pleading rules require the complaint to provide the defendant notice of the claim and the grounds upon which it rests.  See Phillips v. Cty. of Allegheny, 515 F.3d 224, 232 (3d Cir. 2008).  The plaintiff must present facts that, accepted as true, demonstrate a plausible right to relief.  See Fed. R. Civ. P. 8(a).  Although Federal Rule of Civil Procedure 8(a)(2) requires "only a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint may nevertheless be dismissed under Federal Rule of Civil Procedure 12(b)(6) for its "failure to state a claim upon which relief can be granted."  See Fed. R. Civ. P. 12(b)(6).

When ruling on a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that their claims are facially plausible.  See Iqbal, 556 U.S. at 678; Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009).  The plausibility standard requires more than a mere possibility that the defendant is liable for the alleged misconduct: "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  See Iqbal, 556 U.S. at 679 (citing Fed. R. Civ. P. 8(a)(2)).

Accordingly, the United States Court of Appeals for the Third Circuit has identified the following steps that a district court must take when reviewing a 12(b)(6) motion: (1) identify the

elements that a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint that are "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief." See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (internal citations and quotation marks omitted). The Third Circuit has specified that in ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." See Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

In the context of pro se prisoner litigation, the court must be mindful that a document filed pro se is "to be liberally construed." See Estelle v. Gamble, 429 U.S. 97, 106 (1976). A pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can be dismissed for failure to state a claim only if it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).

### B.    Motion for Summary Judgment

Federal Rule of Civil Procedure 56(a) requires the Court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

6

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  See id. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Anderson, 477 U.S. at 257; Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am., 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the Court must view the facts and all reasonable inferences in favor of the nonmoving party.  See Moore v. Tartler, 986 F.2d 682 (3d Cir. 1993); Clement v. Consol. Rail Corp., 963 F.2d 599, 600 (3d Cir. 1992); White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings.  When the party seeking summary judgment satisfies its burden under Rule 56 of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required to go beyond his pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue.  See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts."  See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586 (1986).  When Rule 56 shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case that it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  See Celotex, 477 U.S. at 323; see also Harter v. G.A.F. Corp., 967 F.2d 846, 851 (3d Cir. 1992).

In determining whether an issue of material fact exists, the Court must consider the evidence in the light most favorable to the nonmoving party.  See White, 862 F.2d at 59.  In doing so, the Court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.  See id. (citations omitted).  However, a party opposing a summary judgment motion must comply with Local Rule 56.1, which specifically directs the oppositional party to submit a "statement of the material facts, responding to the numbered paragraphs set forth in the statement required [to be filed by the movant], as to which it is contended that there exists a genuine issue to be tried"; if the nonmovant fails to do so, "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed to be admitted."  See L.R. 56.1.  A party cannot evade these litigation responsibilities in this regard simply by citing the fact that he is a pro se litigant.  These rules apply with equal force to all parties.  See Sanders v. Beard, Civ. No. 09-1384, 2010 WL 2853261, at *5 (M.D. Pa. July 20, 2010) (stating that pro se parties "are not excused from complying with court orders and the local rules of court"); Thomas v. Norris, Civ. No. 02-01854, 2006 WL 2590488, at *4 (M.D. Pa. Sept. 8, 2006) (explaining that pro se parties must follow the Federal Rules of Civil Procedure).

### C.    **Bivens** Action

A Bivens civil rights action asserted under § 1331 is evaluated using the same standards applicable to a § 1983 civil rights action.  See Paton v. LaPrade, 524 F.2d 862, 871 (3d Cir. 1975); Veteto v. Miller, 829 F. Supp. 1486, 1492 (M.D. Pa. 1992).  To state a claim under Bivens, a plaintiff must allege that he was deprived of a federal right by a person acting under color of federal law.  See Young v. Keohane, 809 F. Supp. 1185, 1199 (M.D. Pa. 1992).

### III.    STATEMENT OF MATERIAL FACTS[2]

As noted <u>supra</u>, Plaintiff is currently incarcerated at AUSP Thomson.  (Doc. No. 47 ¶ 1.)

He was previously designated to the Special Management Unit ("SMU") at USP Lewisburg.  (<u>Id.</u>

¶ 2.)  He was incarcerated in the SMU from October 22, 2018 until his transfer to AUSP

Thomson on November 25, 2019.  (<u>Id.</u>)  Plaintiff "was assigned a lower bunk for the entirety of

his designation of USP Lewisburg with the exception of [a] nine-minute period of time on

October 22, 2018, when he first arrived at the institution."  (<u>Id.</u> ¶ 3.)  Plaintiff's designation to an

upper bunk "was likely entered in error because [he] was then reassigned to a lower bunk on

another housing unit."  (<u>Id.</u> ¶ 4.)

---

[2] The Local Rules provide that in addition to the requirement that a party file a brief in opposition to the moving party's brief in support of its motion, "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of material facts responding to the numbered paragraphs set forth in the statement [of material facts filed by the moving party] . . . as to which it is contended that there exists a genuine issue to be tried."  <u>See</u> M.D. Pa. L.R. 56. 1.  The Rule further requires the inclusion of references to the parts of the record that support the statements.  <u>See id.</u>  Finally, the Rule states that the statement of material facts required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.  <u>See id.</u>

   Unless otherwise noted, the background herein is derived from Defendants' Rule 56.1 statement of facts.  (Doc. No. 47.)  Plaintiff failed to file a response to Defendants' statement of material facts in compliance with M.D. Pa. L.R. 56.1.  However, he has filed a verified amended complaint, which may be treated as an affidavit in opposition to summary judgment.  <u>See Ziegler v. Eby</u>, 77 F, App'x 117, 120 (3d Cir. 2003) (noting that "the complaint was not verified, thereby precluding the District Court from treating it as the equivalent of an affidavit for purposes of Federal Rule of Civil Procedure 56(e)"); <u>Reese v. Sparks</u>, 760 F.2d 64, 67 (3d Cir. 1985) (treating verified complaint as an affidavit on summary judgment motion); <u>see also</u> <u>Boomer v. Lewis</u>, No. 06-850, 2009 WL 2900778, at *2 n.4 (M.D. Pa. Sept. 9, 2009) ("A verified complaint may be treated as an affidavit in support of or in opposition to a motion for summary judgment if the allegations are specific and based on personal knowledge.").  However, this Court is not "required to accept unsupported, self-serving testimony as evidence sufficient to create a jury question."  <u>See</u> <u>Hammonds v. Collins</u>, Civ. No. 12-236, 2016 WL 1621986, at *3 (M.D. Pa. Apr. 20, 2016) (citing <u>Brooks v. Am. Broad. Co.</u>, 999 F.2d 167, 172 (6th Cir. 1993)).  Accordingly, unless otherwise noted, the Court deems the facts set forth by Defendants to be undisputed.  <u>See</u> M.D. Pa. LR 56. 1; Fed. R. Civ. P. 56(e)(2).

Defendant Edinger has been employed by the BOP since 2011.  (Id. ¶ 5.)  He is currently employed as the Clinical Director at USP Lewisburg.  (Id. ¶ 6.)  Defendant Viator has been employed by the BOP since August of 2015.  (Id. ¶ 9.)  He is currently employed as a dentist at the Federal Correctional Complex Hazelton in Bruceton Mills, West Virginia.  (Id. ¶ 7.)  He was previously employed as a dentist at USP Lewisburg.  (Id. ¶ 8.)

### A.  Facts Regarding Plaintiff's Medical Treatment

Defendant Edinger evaluated Plaintiff on October 29, 2018.  (Id. ¶ 10.)  At that time, Plaintiff "had a known history of lower back pain for which he was treated with Meloxicam, a nonsteroidal anti-inflammatory drug." (Id. ¶ 11.)  Plaintiff "complained of kidney pain; however, when questioned further he localized pain in his lower back that attributed to nerve damage." (Id. ¶ 12.)  His symptoms "were actually consistent with arthritic findings, which were further reported by previous scans of his spine." (Id. ¶ 13.)  Defendant Edinger prescribed Naproxen as needed.  (Id. ¶ 14.)  At no time was Plaintiff "ever prescribed let alone denied any medication prescribed by [an] outside provider while at USP Lewisburg." (Id. ¶ 15.)  "Of note, [Plaintiff] refused referral to an outside provider in June 2018 for evaluation and pain management for his back." (Id. ¶ 16.)

Plaintiff began engaging in a hunger strike on May 21, 2019.  (Id. ¶ 17.)  In accordance with BOP policy, "an inmate is considered to be on hunger strike if he communicates to staff, or staff observe that the inmate has refrained from eating for a period of time, ordinary in excess of 72 hours." (Id. ¶ 18.)  Inmates on a hunger strike "undergo a baseline evaluation and have their weight and vital sights recorded by Health Services staff at least once every 24 hours." (Id. ¶ 19.)  Health Services staff closely followed Plaintiff daily from May 21-30, 2019.  (Id. ¶ 20.)  Plaintiff told staff that:

> his hunger strike was connected to his request for: (1) an annual dental appointment;
> (2) restoration of nerve pain medication, medication for kidney/liver disease, and
> an adequate mattress; (3) soft sole shoes; (4) extra portion food trays for two weeks;
> (5) four hours of law library daily for a week; [and (6)] transfer to another prison
> or housing unit until prison transfer is approved.

(Id. ¶ 21.)  Plaintiff ended his hunger strike on May 30, 2019.  (Id. ¶ 22.)  On June 27, 2019, he

was seen for complaints of lower back pain.  (Id. ¶ 23.)  His Naproxen prescription was refilled.

(Id. ¶ 24.)

Plaintiff began another hunger strike on July 9, 2019.  (Id. ¶ 25.)  On July 10, 2019, he

requested:

> (1) new housing assignment; (2) legal material; (3) soft shoes to support his lower
> back; (4) fitting for "front dentures;" (5) treatment for kidney failure/liver disease;
> nerve medication; (6) double portions of meals for the next two weeks; and (7)
> approval to test-out of SMU program or receive transfer to a facility to treat
> liver/kidney disease and a safe, healthy environment immediately.

(Id. ¶ 26.)  Plaintiff "has not shown any evidence of liver or kidney disease; therefore[,] no

medication [or] referral for treatment has been clinically indicated."  (Id. ¶ 27.)  Prior to his

hunger strike, Plaintiff's "only medication was Naproxen, an anti-inflammatory medication used

to treat arthritic and musculoskeletal pain, to address his complaints of his lower back pain."  (Id.

¶ 28.)

On July 11, 2019, Defendant Edinger met with Plaintiff "to discuss his requests and

informed him there was no clinical indication for soft shoes, his request for nerve medication, a

cell assignment change, or his alleged kidney/liver disease."  (Id. ¶ 29.)  Plaintiff was also told

that "he would receive extra meals for a 'short time' upon the discontinuation of his hunger

strike, that he would need to discuss his cell change request with [his] custody/unit team and that

the decision to move him to another facility was going to happen anyway because the SMU was

being closed." (Id. ¶ 30.) Defendant Edinger told Plaintiff that he would be monitored daily pursuant to the hunger strike policy. (Id. ¶ 31.)

On July 19, 2019, Plaintiff was moved to an observation cell to be monitored more closely. (Id. ¶ 32.) He "claimed he began refusing to drink water." (Id.) "For safety reasons, [Plaintiff's] Naproxen was placed on hold while he remained on hunger strike to avoid potential gastritis." (Id. ¶ 33.) On July 26, 2019, Defendant Edinger reviewed Plaintiff's records and physical assessment and decided "to involuntarily feed [Plaintiff] via nasogastric (NG) tube." (Id. ¶ 34.) These feedings occurred until August 2, 2019, when Defendant Edinger determined that Plaintiff's labs had stabilized. (Id. ¶ 35.) On August 14, 2019, Plaintiff was given intravenous ("IV") fluids because of dehydration. (Id. ¶ 36.) Staff "recommended involuntary feedings by a NG on August 19, 2019, and continued [them] through August 23, 2019." (Id. ¶ 37.)

On August 20, 2019, Defendant Edinger approved Plaintiff to receive Ensure Plus "to provide appropriate nutrition more efficiently." (Id. ¶ 38.) On August 26, 2019, Defendant Edinger started Plaintiff on a vitamin supplement during pill line. (Id. ¶ 39.) Staff "recommended NG tube feedings on September 3, 2019, and continued [them] through September 13, 2019." (Id. ¶ 40.) On September 16, 2019, staff members attempted to give IV fluids to Plaintiff "but were unable to obtain venous access." (Id. ¶ 41.) As a result, staff ordered intraosseous infusion—infusion directly into the bone marrow—but Plaintiff "ultimately consented to drinking water orally." (Id. ¶ 42.)

On September 18, 2019, "after initially refusing to drink and refusing intravenous fluids, [Plaintiff] drank water and Ensure when informed his vital signs indicated dehydration." (Id. ¶ 43.) On September 20, 2019, Plaintiff told Defendant Edinger that he would agree to drinking

three (3) cans of Ensure in lieu of each meal.  (Id. ¶ 44.)  Plaintiff "agreed to hydrate by drinking water, take his vitamin[,] and comply with daily hunger strike assessments."  (Id. ¶ 45.)

On September 23, 2019, Plaintiff refused to drink Ensure unless certain demands were met.  (Id. ¶ 46.)  Defendant Edinger spoke to Plaintiff and told him that "all of his requests were non-medical in nature."  (Id. ¶ 47.)  Plaintiff ultimately agreed to continue drinking Ensure.  (Id. ¶ 48.)  On September 27, 2019, Plaintiff "again refused to drink Ensure and stated he would return to feedings by a NG tube."  (Id. ¶ 49.)  Staff members told Plaintiff "that he did not qualify for involuntary feedings, but would continue to be monitored daily and would be given NG tube feedings when his vital signs reached the required threshold."  (Id. ¶ 50.)  Plaintiff "resumed voluntarily consuming Ensure on September 30, 2019."  (Id. ¶ 51.)

On November 7, 2019, Defendant Edinger noted that staff members had observed Plaintiff "manipulating his genitals during delivery of his Ensure in his cell."  (Id. ¶ 52.)  As a result, "staff altered their delivery to provide the supplements to [Plaintiff] while he remained handcuffed in Health Services."  (Id. ¶ 53.)  On November 12, 2019, Plaintiff began refusing the Ensure.  (Id. ¶ 54.)  On November 15, 2019, Plaintiff refused his medication.  (Id. ¶ 55.)  On November 18, 2019, Plaintiff "was given the option to drink water or be given IV fluids."  (Id. ¶ 56.)  Plaintiff "opted to drink water and indicated he would continue to drink water throughout the day."  (Id. ¶ 57.)

On November 19, 2019, Defendant Edinger noted that Plaintiff "had lost fourteen pounds in one week, indicating a lack of nutritional reserves and dehydration."  (Id. ¶ 58.)  He counseled Plaintiff "on the dangers of continuing his refusal to eat or drink."  (Id. ¶ 59.)  Plaintiff stated he would drink Ensure only if he were provided six (6) cartons at each meal.  (Id. ¶ 60.)  Defendant Edinger "told [Plaintiff] he would provide four at the morning meal and five in the evening[,] but

[Plaintiff] still continued to refuse." (Id. ¶ 61.)  Plaintiff refused to respond to Defendant Edinger when he told Plaintiff "he would be offered the previous regimen of Ensure or resume involuntary NG feedings." (Id. ¶ 62.)

On November 20, 2019, Plaintiff refused his Ensure supplements unless he was given six (6) cartons at each meal. (Id. ¶ 63.) Defendant Edinger "advised [Plaintiff] of the potential side effects of overloading his intestinal tract by consuming such volume at one time." (Id. ¶ 64.) Plaintiff continued to insist on receiving twelve (12) cartons. (Id. ¶ 65.) Defendant Edinger "ultimately permitted twelve cartons daily to be provided with the caveat that the order would be reduced if [Plaintiff] experienced pain or diarrhea." (Id. ¶ 66.) Plaintiff "consumed all six cartons at that meal, as well as water." (Id. ¶ 67.) On November 21, 2019, Plaintiff consumed two (2) cartons and refused the rest "because he wanted another flavor other than strawberry." (Id. ¶ 68.) "Recognizing the importance of his hydration and caloric intake, [Defendant] Edinger agreed to provide six cartons of regular vanilla Ensure as opposed to strawberry Ensure Plus." (Id. ¶ 69.) On November 23, 2019, Plaintiff "refused vanilla Ensure and demanded Ensure Plus." (Id. ¶ 70.) Plaintiff "ultimately consented to the vanilla Ensure and drank the cartons in his cell." (Id. ¶ 71.) On November 25, 2019, Plaintiff was transferred from USP Lewisburg, having missed approximately 425 meals. (Id. ¶ 72.)

During his hunger strike, Plaintiff "received daily medical evaluations to assess his vital signs." (Id. ¶ 73.) At no time did he require treatment for high blood pressure or diabetes. (Id. ¶ 74.) Plaintiff's "vital signs were taken daily and lab work was performed as needed to assess [Plaintiff's] kidney and liver function, as well as his nutritional status." (Id. ¶ 75.) At no time during the strike was his health in danger. (Id. ¶ 76.) Plaintiff' "pre-albumin levels were tested repeatedly to assess his level of nutritional stress." (Id. ¶ 77.) "Traditionally, medical

14

intervention takes place when the level falls to 11 or below, with normal levels being between 18 and 45." (Id. ¶ 78.)  Plaintiff's levels never fell below 14.  (Id. ¶ 79.)  Plaintiff was offered food three (3) times a day and refused at every occasion.  (Id. ¶¶ 80-81.)  When his "health status dropped to a medically unacceptable level, he was brought to Health Services for nasogastric feeding."  (Id. ¶ 82.)  On each occasion, Plaintiff "was informed of the risks associated with this procedure."  (Id. ¶ 83.)  Plaintiff "underwent nasogastric feeding until his pre-albumin levels had risen back into the normal range."  (Id. ¶ 84.)  At no time was Plaintiff's "health in profound jeopardy such that he required hospitalization."  (Id. ¶ 85.)  Defendant Edinger had "multiple conversations" with Plaintiff about the short- and long-term health consequences of his hunger strike.  (Id. ¶ 86.)  Defendant Edinger was unable to convince Plaintiff to end his hunger strike and believed that Plaintiff "continued to engage in his behavior in order to exert control and manipulate desired outcomes."  (Id. ¶¶ 87-88.)

**B.    Facts Regarding Plaintiff's Dental Treatment**

On December 27, 2018, two (2) months after arriving at USP Lewisburg, Plaintiff saw Defendant Viator for a dental health history.  (Id. ¶ 89.)  At that time, Plaintiff asked "to have what remained of his two upper front teeth removed."  (Id. ¶ 90.)  He stated that "there was an infection affecting his gums and causing pain and swelling."  (Id. ¶ 91.)  Plaintiff noted further that his front teeth had "previously been damaged and cracked."  (Id. ¶ 92.)  An examination revealed that the remaining portions of the teeth had decay and cavities, and Defendant Viator determined that extraction was the appropriate course of action.  (Id. ¶¶ 93-94.)  Plaintiff consented to the procedure.  (Id. ¶ 95.)  Defendant Viator removed the remaining roots of both teeth and inserted sutures.  (Id. ¶ 96.)  He prescribed Ibuprofen for pain but counseled Plaintiff that "it should not be taken in combination with his Naprosen prescription."  (Id. ¶ 97.)

Defendant Viator provided a handout on post-operative care and advised Plaintiff on how to request dental care if he needed it.  (Id. ¶¶ 98-99.)

Plaintiff "raised no concerns regarding swelling, bleeding gums, abscesses, or infection for the remainder of his thirteen[-]month designation to USP Lewisburg."  (Id. ¶ 100.)  His only request was for a routine cleaning and fitting for dental prostheses.  (Id. ¶ 101.)  "Inmates are seen for routine dental care in accordance with their placement on the BOP's Dental Routine Treatment List, a national waiting list for dental care."  (Id. ¶ 102.)  An inmate retains his status on the list even if he is transferred to a new facility.  (Id. ¶ 103.)  Plaintiff submitted a request for routine check-up on January 1, 2019.  (Id. ¶ 104.)  He was told that he would be scheduled "when his name reached the top of the national waiting list."  (Id. ¶ 105.)  He "was informed of the general delay in scheduling routine care appointments for inmates in restraints, on hunger strikes, or on suicide watch until they returned to normal status."  (Id. ¶ 106.)

Plaintiff also requested a partial dentures plate.  (Id. ¶ 107.)  Dentures, however, "are usually the final part of routine treatment for someone that needs them."  (Id. ¶ 108.)  Prior to being considered for prostheses, Plaintiff "would have required a routine care appointment, for which he would have to be eligible based on his position on the national waiting list."  (Id. ¶ 109.)  "Once eligibility on [the] waiting list occurs, this is when the treatment plan is devised, for x-rays to be taken, and for all teeth requiring either repair[] or [to be] pulled to be documented on the plan."  (Id. ¶ 110.)  After a treatment plan is created, "a request is made to the Regional Chief Dentists for fabrication of dentures."  (Id. ¶ 111.)  BOP policy, however, "dictates that an inmate with eight or more posterior teeth in occlusion should not receive dental prostheses because he or she is able to chew food adequately."  (Id. ¶ 112.)  Plaintiff is missing five (5) teeth but has over eight (8) teeth in occlusion.  (Id. ¶ 113.)  Accordingly, he "would not have been eligible for a

partial plate or dentures per policy regardless of a preceding routine treatment."  (Id. ¶ 114.)

Plaintiff alleges that he previously had a gold denture plate that he lost in December of 2018, but

Defendant Viator "sees no reason [Plaintiff] would have required dentures, particularly at that

time as he was only missing three teeth."  (Id. ¶¶ 115-16.)  Plaintiff "did not qualify for dentures

or a partial plate even after the extraction of two additional front teeth."  (Id. ¶ 117.)

## IV.    DISCUSSION

The Eighth Amendment prohibits the infliction of cruel and unusual punishment of

prisoners.  See Farmer v. Brennan, 511 U.S. 825, 834 (1994) (noting that "[t]o violate the Cruel

and Unusual Punishment Clause, a prison official must have a sufficiently culpable state of

mind. . . .  In prison-conditions cases that state of mind is one of 'deliberate indifference' to

inmate health or safety.").  An Eighth Amendment claim includes both objective and subjective

components.  See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  Serious hardship to the prisoner is

required to satisfy the Eighth Amendment's objective component.  See id.  The subjective

component is met if the person or persons causing the deprivation acted with "a sufficiently

culpable state of mind."  See id.  In the context of medical care, the Eighth Amendment "requires

prison officials to provide basic medical treatment to those whom it has incarcerated."  See

Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).  In order to establish an Eighth Amendment

deliberate indifference claim, a claimant must demonstrate "(i) a serious medical need, and (ii)

acts or omissions by prison officials that indicate deliberate indifference to that need."  See

Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 582 (3d Cir. 2003).

Deliberate indifference has been found "where the prison official (1) knows of a

prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary

medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving

needed or recommended medical treatment."  See Rouse, 182 F.3d at 197.  The "deliberate indifference" prong of the Eighth Amendment test requires that the defendant actually know of and disregard "an excessive risk to inmate health or safety."  See Farmer, 511 U.S. at 837. Circumstantial evidence may establish subjective knowledge if it shows that the excessive risk was so obvious that the official must have known about it.  See Beers-Capitol v. Whetzel, 256 F.3d 120, 133 (3d Cir. 2001) (citing Farmer, 511 U.S. at 842).  Moreover, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  See Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004).  Accordingly, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." See id.

The second prong of the Eighth Amendment inquiry is whether the plaintiff's medical needs were serious.  A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  See Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).  Not every condition is a serious medical need; instead, the serious medical need element contemplates a condition of urgency, namely, one that may produce death, degeneration, or extreme pain.  See id.  Moreover, because only egregious acts or omissions violate this standard, mere medical malpractice cannot result in an Eighth Amendment violation. See White v. Napoleon, 897 F.2d 103, 108-10 (3d Cir. 1990); see also Estelle v. Gamble, 429 U.S. 97, 106 (1976) (noting that "medical malpractice does not become a constitutional violation merely because the victim is a prisoner").

Additionally, prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients, see Young v. Kazmerski, 266 F. App'x 191, 194 (3d Cir. 2008), and a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment.  See White, 897 F.2d at 108-10.  Furthermore, it is well settled that an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim.  See Taylor v. Norris, 36 F. App'x 228, 229 (8th Cir. 2002); Abdul-Wadood v. Nathan, 91 F.3d 1023, 1024-25 (7th Cir. 1996); Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir.1994); Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."); see also Pearson v. Prison Health Servs., 850 F.3d 528, 535 (3d Cir. 2017) ("[W]hen medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care.").

### A.    Claims Against Defendant Edinger

In the instant case, Defendants maintain that Defendant Edinger did not violate Plaintiff's Eighth Amendment rights because he provided appropriate treatment to Plaintiff.  (Doc. No. 46 at 11-12.)  They assert that Plaintiff's claims against Defendant Edinger amount to no more than disagreement with his care and treatment, and that some of the treatment Plaintiff alleges to have not received was not medically indicated.  (Id.)  For the reasons set forth below, the Court agrees with Defendants.

In his amended complaint, Plaintiff maintains that Defendant Edinger denied him treatment during Plaintiff's hunger strike.  (Doc. Nos. 28 at 5; 30 at 2-3.)  Plaintiff maintains further that Defendant Edinger denied "all treatments," including prescriptions from an outside specialist and for soft shoes.  (Doc. No. 28 at 6.)  According to Plaintiff, he was placed on a top

bunk in a top tier and denied the Dilaudid that had been prescribed to him by an outside provider.

(Id.)  Plaintiff further faults Defendant Edinger for failing to send him to an outside provider

when Plaintiff experienced "continued organ/kidney/liver failure from a history of elevated

enzymes."  (Id. at 13.)  Plaintiff further suggests that he has not been provided treatment for

various ailments, including scoliosis, chronic pain, cervical spine injuries, and degenerative joint

disease.  (Id.)

The record before the Court, however, indicates that Plaintiff's claims against Defendant

Edinger lack merit.  While Plaintiff has a known history of lower back pain (Doc. No. 47 ¶ 11),

his medical records indicate that he was assigned to a lower bunk for the entirety of his

incarceration at USP Lewisburg with the exception of a nine (9)-minute period of time (id. ¶ 3).

The upper bunk designation was "likely entered in error because [Plaintiff] was then reassigned

to a lower bunk on another housing unit."  (Id. ¶ 4.)  Moreover, the record belies Plaintiff's claim

that Defendant Edinger denied him the Dilaudid allegedly prescribed by an outside provider.

The evidence cited to the Court by Defendants reflects that in June of 2018, Plaintiff refused a

referral to an outside provider for an evaluation and pain management for his back.  (Id. ¶ 16.)

Moreover, nothing in the record indicates that Plaintiff had ever been prescribed any medication

by an outside provider while at USP Lewisburg.  (Id. ¶ 15.)  Even if an outside provider had

prescribed Dilaudid to Plaintiff, there is no viable claim for an Eighth Amendment violation

where one provider disagrees with or does not follow another doctor's recommendation.  See

White, 897 F.2d at 110.  Additionally, the evidence cited to the Court does not indicate that

Plaintiff required treatment for high blood pressure, diabetes, and liver and kidney failure as he

suggests because there were no clinical indications that Plaintiff suffered from these conditions.

(Id. ¶¶ 27, 29, 74-76.)  Finally, Defendant Edinger concluded that Plaintiff's requests for nerve

medication, a special mattress, and soft shoes were not medically necessary.  (Id. ¶¶ 29.)

Defendant Edinger treated Plaintiff's lower back pain with Naproxen and addressed his

complaints of lower back pain during his incarceration at USP Lewisburg.  (Id. ¶¶ 11-14, 23-24.)

     While Plaintiff avers that Defendant Edinger failed to treat various ailments and provide

certain accommodations, Plaintiff has provided no evidence to support his allegations, and he

cannot survive summary judgment by relying on unsupported assertions, conclusory allegations,

or mere suspicions.  See, e.g., Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir.

1989) (noting that the party opposing summary judgment must raise "more than a mere scintilla

of evidence in its favor").  Plaintiff's claims against Defendant Edinger regarding the failure to

treat various ailments and provide certain accommodations amount to no more than a

disagreement with him regarding appropriate medical care and Plaintiff's inability to receive the

type of treatment he desired.  A prisoner, however, is not entitled to the treatment of his choice.

See Reed v. Cameron, 380 F. App'x 160, 162 (3d Cir. 2010).  Additionally, a complaint that a

provider or a medical department "has been negligent in diagnosing or treating a medical

condition does not state a valid claim of medical mistreatment under the Eighth Amendment

[because] medical malpractice does not become a constitutional violation merely because the

victim is a prisoner."  See Estelle, 429 U.S. at 106.

     The record also belies Plaintiff's claim that Defendant Edinger denied him medical

treatment during his hunger strike.  In support of their motion, Defendants have submitted over

900 pages of Plaintiff's medical records.  These records indicate that during his hunger strike,

Plaintiff received daily medical evaluations to assess his vital signs.  (Doc. No. 47 ¶¶ 20, 31, 73.)

Plaintiff underwent regular testing to assess his kidney and liver functions as well as his pre-

albumen levels.  (Id. ¶¶ 75, 77-79.)  At no time was Plaintiff's health "in profound jeopardy such that he required hospitalization."  (Id. ¶ 85.)

The record reflects further that Defendant Edinger regularly counseled Plaintiff about the short- and long-term health consequences of a hunger strike.  (Id. ¶¶ 59, 64, 86.)  Moreover, during the hunger strike, Plaintiff was offered three (3) meals a day and refused each meal.  (Id. ¶¶ 80-81.)  On more than one (1) occasion, when his health dropped below an acceptable level, Defendant Edinger made the medical decision to conduct nasogastric feeding.  (Id. ¶¶ 34-35, 37, 40, 82.)  On each occasion, Plaintiff was informed of the risks associated with nasogastric feeding.  (Id. ¶ 83.)  Finally, Defendant Edinger approved a medical regimen of Ensure Plus to provide appropriate nutrition to Plaintiff.  (Id. ¶ 38.)  The record also indicates that Defendant Edinger ultimately agreed to provide Plaintiff six (6) cartons of Ensure for each meal, with the caveat that the "order would be reduced if [Plaintiff] experienced pain or diarrhea."  (Id. ¶¶ 63-67.)

Based on this record, there is no basis to conclude that Defendant Edinger was deliberately indifferent to Plaintiff's medical needs during the course of his self-imposed hunger strike.  Plaintiff was regularly monitored and offered meals.  Moreover, Defendant Edinger counseled Plaintiff about the risks posed by a hunger strike and made sure that Plaintiff received adequate nutrition by establishing a regimen whereby Plaintiff received Ensure Plus.  See Austin v. Tennis, 381 F. App'x 128, 133 (3d Cir. 2010) (concluding that the district court properly granted summary judgment to the defendants on an inmate-plaintiff's claim that the defendants were deliberately indifferent to his medical needs throughout the course of a hunger strike).  Plaintiff's complaints amount to no more than a disagreement with Defendant Edinger's provision of care during the hunger strike, which is insufficient for Plaintiff to maintain an

Eighth Amendment claim against Defendant Edinger.  See Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).  Accordingly, the Court will grant summary judgment to Defendant Edinger with respect to Plaintiff's Eighth Amendment claims against him.[3]

**B.     Claims Against Defendant Viator**

In the instant case, Defendants maintain that Defendant Viator did not violate Plaintiff's Eighth Amendment rights because he provided appropriate treatment to Plaintiff.  (Doc. No. 46 at 12-13.)  They assert that Plaintiff's claims against Defendant Viator, like his claims against Defendant Edinger, amount to no more than disagreement with his care and treatment.  (Id. at 11.)  For the reasons set forth below, the Court agrees with Defendants.

In his amended complaint, Plaintiff maintains that Defendant Viator refused to pull and replace Plaintiff's fillings.  (Doc. No. 28 at 13.)  He also suggests that Defendant Viator refused Plaintiff annual dental examinations and cleanings and refused to refer Plaintiff to an outside dentist.  (Id. at 14.)  Plaintiff further alleges that Defendant Viator "refus[ed] to follow through with procedures" by failing to replace Plaintiff's partial dentures.  (Doc. No. 30 at 6.) Specifically, he states Defendant Viator's refusal to create impressions for new partial dentures

---

[3] In his amended complaint, Plaintiff vaguely asserts that his First Amendment rights were violated when he was subjected to daily medical co-pays during his hunger strike.  (Doc. No. 30 at 3.)  As an initial matter, Plaintiff does not appear to assert that Defendant Edinger was personally involved in the deduction of the co-pays from his inmate account.  In any event, to the extent Plaintiff asserts a First Amendment retaliation claim, nothing in the record before the Court suggests that the deduction of these co-pays from Plaintiff's account was an adverse action or that the assessment of such co-pays was not reasonably related to an adequate penological interest.  See Whitehead v. Wetzel, 720 F. App'x 657, 661 (3d Cir. 2017) (concluding that the inmate-plaintiff could not maintain a First Amendment retaliation claim where his amended complaint "show[ed] that the co-pays were deducted in exchange for the benefit of his healthcare"); Harper v. Tritt, No. 3:16-cv-1640, 2017 WL 4700730, at *8 (M.D. Pa. Oct. 19, 2017) (dismissing an inmate-plaintiff's First Amendment retaliation claim based upon the deduction of co-pays and concluding that the assessment of such co-pays was "lawfully and reasonably related to an adequate penological interest").

caused him to develop fistulas and abscesses around his gum line and that he was denied antibiotics for those conditions.  (Id. at 4-6.)

"Dental care is one of the most important medical needs of inmates."  See Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir 1989) (quoting Ramos v. Lamm, 639 F.2d 559, 576 (10th Cir. 1980)).  Contrary to Plaintiff's suggestions, however, the record clearly establishes that Defendant Viator provided dental care to Plaintiff and that partial dentures were not medically indicated.  The record reflects that Defendant Viator conducted a dental health screening for Plaintiff on December 27, 2018, two (2) months after Plaintiff arrived at USP Lewisburg.  (Doc. No. 47 ¶ 89.)  Plaintiff requested to have the remains of his two (2) upper front teeth removed, and Defendant Viator conducted the extraction.  (Id. ¶¶ 90-96.)  Defendant Viator prescribed Ibuprofen for pain and counseled Plaintiff on how to request dental care should he need it.  (Id. ¶¶ 97-99.)

The record reflects further that Plaintiff "raised no concerns regarding swelling, bleeding gums, abscesses, or infection for the remainder of his thirteen[-]month designation to USP Lewisburg, which concluded on November 25, 2019."  (Id. ¶ 100.)  Plaintiff's only dental request made during this time focused on being scheduled for a routine cleaning and being fit for a partial plate.  (Id. ¶¶ 101, 104, 107.)  Plaintiff was advised that he would be scheduled for a routine cleaning when his name reached the top of the BOP's national Dental Routine Treatment List.  (Id. ¶¶ 102-05.)  He was "informed of the general delay in scheduling routine care appointments for inmates in restraints, on hunger strikes, or on suicide watch until they returned to normal status."  (Id. ¶ 106.)  Moreover, to be considered for dental prostheses, Plaintiff would first have to undergo his routine care appointment.  (Id. ¶ 109.)  Even so, pursuant to BOP policy and Defendant Viator's opinion, neither a partial plate nor the use of dentures was medically

indicated because Plaintiff "has over eight teeth in occlusion to permit him to chew and consume food." (Id. ¶¶ 112-17.)

Plaintiff avers that Defendant Viator refused to provide him dental care during his incarceration at USP Lewisburg. Plaintiff, however, has provided no evidence to support his allegations, and, as noted previously, cannot survive summary judgment by relying on unsupported assertions, conclusory allegations, or mere suspicions. See, e.g., Williams, 891 F.2d at 460. Plaintiff's claims against Defendant Viator amount to no more than a disagreement with him regarding the appropriate dental care and Plaintiff's inability to receive the type of dental treatment he desired. As noted above, however, a prisoner is not entitled to the treatment of his choice. See Reed, 380 F. App'x at 162; see also King v. United States, 536 F. App'x 358, 362-63 (4th Cir. 2013) (concluding that dental staff were not deliberately indifferent for failing to perform a root canal); James v. Pa. Dep't of Corr., 230 F. App'x 195, 197 (3d Cir. 2007) (noting that "[a]lthough [plaintiff] may have preferred a different course of treatment, his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts"); Galindo v. Cate, No. 1:11-CV-23-DLB PC, 2011 WL 6100623, at *2-3 (E.D. Cal. Dec. 6, 2011) (dismissing Eighth Amendment claims based upon failure to provide a root canal upon concluding that an inmate-plaintiff's disagreement with the recommended extraction "indicates a difference of opinion and not deliberate indifference"); Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975) (concluding that a difference of opinion regarding dental care did not support an Eighth Amendment violation because "even if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention"). Moreover, Plaintiff's disagreement with Defendant Viator regarding appropriate dental care does not support a claim of cruel and unusual

punishment.  See Farmer, 685 F. Supp. at 1339.  Additionally, a complaint that a dentist or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment [because] medical malpractice does not become a constitutional violation merely because the victim is a prisoner." See Estelle, 429 U.S. at 106.  In the instant case, the record does not establish that Defendant Viator knew of Plaintiff's need for dental treatment and intentionally refused to provide it, delayed necessary dental treatment for a non-medical reason, or prevented Plaintiff from receiving needed or recommended dental treatment.  Consequently, the Court will grant Defendant Viator summary judgment as to Plaintiff's Eighth Amendment claims against him.

## V.      CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and for summary judgment (Doc. No. 45) will be granted.[4]  An appropriate Order follows.

---

[4] On June 18, 2020, Plaintiff filed a motion to alter or amend judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure.  (Doc. No. 48.)  He seeks reconsideration of the Court's dismissal of all Defendants except Defendants Edinger and Viator in its January 21, 2020 Memorandum and Order (Doc. Nos. 33, 34) based on newly discovered evidence (Doc. No. 48 at 1).  A motion for reconsideration is a device of limited utility, which may "not be used as a means to reargue matters already argued and disposed of or as an attempt to relitigate a point of disagreement between the Court and the litigant."  See Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 606 (M.D. Pa. 2002) (citations omitted); see also Baker v. Astrue, Civ. No. 07-4560, 2008 WL 4922015, at *1 (E.D. Pa. Nov. 17, 2008).  Rather, a court may alter or amend its judgment only upon a showing from the movant of one of the following: "(1) an intervening change in the controlling law; (2) the availability of new evidence . . . or (3) the need to correct a clear error of law or fact or to prevent manifest injustice."  See Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (citing N. River Ins. Co. v. CIGNA Reinsurance Co., 52 F.3d 1194, 1218 (3d Cir. 1995)).

Plaintiff alleges that he recently discovered that he was the victim of identity theft that has led to him experiencing cyberbullying via a server and microchip in his head.  (Doc. No. 48 at 1-2.)  Plaintiff goes on to list a litany of incidents that have occurred, including a belief that his food has been drugged and his family has been "scammed, torture[d], [and] allegedly murdered or kidnapped."  (Id. at 2.)  Plaintiff's motion, however, does not cause the Court to conclude that reconsideration of its January 21, 2020 Memorandum and Order is warranted.  Plaintiff's motion (Doc. No. 48) will, therefore, be denied.